860 F.Supp. 1309 (1994)
The METHODIST HOSPITAL, David E. Ross, M.D., James Jones, M.D., Doug Barthelemy, M.D., Randall C. Morgan, M.D., Deborah McCullough, M.D., Plaintiffs,
v.
INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, Cheryl Sullivan, as Secretary of the Indiana Family and Social Services Administration, Indiana Office of Medicaid Policy and Planning, and James M. Verdier, as Assistant Secretary and Director of the Indiana Office of Medicaid Policy and Planning, Defendants.[1]
Civ. No. 2:93-CV-357-RL.
United States District Court, N.D. Indiana, Hammond Division.
July 8, 1994.
*1310 *1311 *1312 *1313 *1314 Earl F. Hites and Jill M. Madajczyk, Hodges and Davis P.C., Merrillville, IN, Raymond J. Kelly, Jr., Seyfarth, Shaw, Fairweather and Geraldson, Chicago, IL, for plaintiffs.
Matthew R. Gutwein and Richard E. Shevitz, Office of Indiana Atty. Gen., Indianapolis, IN, Joseph S. Van Bokkelen and Timothy G. Kline, Goodman, Ball & Van Bokkelen, Highland, IN, Mark H. Lynch, Vicki J. Larson, Covington & Burling, Washington, DC, for defendants.

MEMORANDUM OPINION AND ORDER
LOZANO, District Judge.
This matter is before the Court on Defendants' Motion to Dismiss and for Summary Judgment, filed January 6, 1994. For the reasons set forth herein, this Motion is GRANTED IN PART and DENIED IN PART. Also pending before this Court is Plaintiffs' Motion to Strike the Declaration of James M. Verdier. For the reasons set forth herein, this Motion is DENIED.

BACKGROUND
On December 21, 1993, the Plaintiffs, the Methodist Hospitals, Inc. ("Methodist") and five doctors (collectively, "Plaintiffs"), who are all health care providers within the City of Gary, Indiana, instituted this action seeking to enjoin the implementation of new rules affecting Medicaid reimbursement for inpatient, outpatient, and physician services provided in the City of Gary to Medicaid recipients.
Methodist is an Indiana non-profit corporation which operates an acute care hospital facility with 410 licensed beds in Gary, Indiana, and an acute care hospital facility with 355 licensed beds in Merrillville, Indiana. Methodist/Northlake, located in Gary, primarily serves the medical needs of the residents of Gary, Indiana. Methodist/Northlake offers comprehensive medical services, and is the only hospital in the City of Gary offering obstetrical services, inpatient nursery services, and neonatal intensive care services. Methodist/Northlake has been designated by the Family and Social Services Administration of the State of Indiana ("FSSA") as a significant disproportionate share hospital. This classification indicates that Methodist/Northlake serves a significantly high number of Medicaid and indigent recipients.
The City of Gary has also been classified by the Health Care Financing Authority ("HCFA"), a division of the Department of Health & Human Services ("HHS"), as a medically underserved area with a critical shortage of primary care physicians.
The Plaintiffs, David E. Ross, M.D., James Jones, M.D., Doug Barthelemy, M.D., Randall C. Morgan, M.D., and Deborah McCullough, M.D., are all physicians who practice medicine in the City of Gary, Indiana, engage in the treatment of Medicaid recipients, and have provider agreements with the Indiana Medicaid Program.
The claims in this case relate to Indiana's decision to implement new rules changing the method by which it reimburses providers for physician services, inpatient hospital services, and outpatient hospital services furnished to Medicaid recipients. The new rules, approved by Governor Bayh, were to take effect on January 1, 1994. The State has agreed to postpone implementation of the new rules.
Medicaid is a cooperative federal/state program through which the federal government grants funds to participating states to provide health care services, including physician and hospital care, to low income *1315 individuals. 42 U.S.C.A. §§ 1396 et seq. (West 1992 and West Supp.1994); see also Wilder v. Virginia Hospital Ass'n, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). A state's participation in Medicaid is voluntary. However, if states choose to participate, they must comply with certain requirements imposed by the Medicaid Act and regulations promulgated by the Secretary of Health and Human Services. Wilder, 496 U.S. at 502, 110 S.Ct. at 2513. To qualify for federal funds, a state must submit a plan for medical assistance to the Secretary of HHS which complies with the requirements outlined in 42 U.S.C. § 1396a(a). Among other obligations imposed by the Medicaid statute and its implementing regulations, a participating state must comply with the "equal access" provision of the Medicaid statute, which requires that a state's plan for medical assistance provide such methods and procedures:
as may be necessary to safeguard against unnecessary utilization of such care and services and to ensure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.
42 U.S.C.A. § 1396a(a)(30)(A) (West Supp. 1994); see also 42 C.F.R. § 447.204.
The new administrative rules ("new rules") affect Medicaid hospital reimbursement for inpatient and outpatient services, and reimbursement for physician services. The new Rules, 405 I.A.C. § 1-10 (LSA Doc. # 93-116, Inpatient Hospital Services), 405 I.A.C. § 1-8-2, 405 I.A.C. § 1-8-3, and 405 I.A.C. § 1-8-4 (LSA Doc. # 93-115, Outpatient Hospital Services), and 405 I.A.C. § 1-11 (LSA Doc. # 93-115, Physicians Services), establish a methodology for reimbursement for hospital and physician services provided under the Indiana Medicaid program. The new rules were announced by Governor Bayh on July 14, 1993. Notice of the new rules was published in the Indiana Daily Star on July 19, 1993, and notice of a public hearing to be held on August 25 and 27, 1993, was published in the August 1, 1993, Indiana Register. Public hearings on the new rules were held on August 25 and 27, 1993. The public hearings were adjourned by the state and resumed on September 7, 1993.
FSSA forwarded LSA Doc. # 93-115 and LSA Doc. # 93-116 to the Attorney General as final rules. The Attorney General approved LSA Doc. # 93-115 and LSA Doc. # 93-116 and forwarded these documents to the Governor. The final rules were approved by Governor Bayh and filed with the Indiana Secretary of State on December 2, 1993. The new rules were to become effective January 1, 1994.
Under the Indiana Medicaid plan in force prior to implementation of the new rules, participating inpatient hospital facilities were reimbursed on the basis of reasonable, allowable costs subject to an aggregate payment ceiling. The reimbursement system provided for reimbursement of hospital services on an interim basis throughout the course of the year based on an estimate of allowable costs and submitted claimed charges. After a hospital's year end, a cost settlement occurred using a predetermined reimbursement allowance per Medicaid discharge. This allowance was calculated using the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") limit. The TEFRA limit was multiplied against the hospital's Medicaid discharges to determine a hospital's specific, aggregate Medicaid upper payment limit for the year. A settlement amount, either owing to the Medicaid program or to the health care provider, was identified and costs settled when the aggregate Medicaid upper payment was compared to the total of the interim payments made for a given year.
New Rule 405 I.A.C. § 1-10 (LSA Doc. # 93-116, Inpatient Hospital Services) changes this methodology. The new rule establishes per diem payment rates for payment of each facility. The per diem payment rate is an all-inclusive rate for each patient-day of service. Payment rates are established by assigning each facility to a group of facilities with defined related characteristics. A per diem base year payment rate for each peer group is established, based on the facilities' allowable costs for fiscal year 1990, and *1316 inflated to mid-point of fiscal year 1994, using a published hospital market basket inflation index.
Facilities with per diem base year costs below the per diem base year rate for the applicable peer group will be reimbursed at the facilities' base year per diem costs, as inflated from the facilities' fiscal year 1990 reporting period to the mid-point of fiscal year 1994 based upon the hospital market basket inflation index. There is no cost settlement under the revised reimbursement methodology. The state estimates that the aggregate Medicaid expenditures for inpatient hospital services will be reduced by 5%, which will result in a reduction of $30.1 million in the Medicaid budget.
Outpatient hospital facilities participating in the Indiana Medicaid program prior to implementation of the new rules were reimbursed based on a predetermined percentage of the provider's customary billing amount for services rendered, not to exceed 100% of the provider's reported cost of the services. The plan required no year end settlement of charges to costs, although a provider could request an appeal of the amounts paid.
The revised reimbursement methodology for outpatient hospital services establishes fixed-fee schedule allowances. Reimbursement for outpatient services is limited to the lower of the submitted charges for the procedures or the established fee schedule allowance for the procedures. Outpatient surgical procedures will be classified into nine groups corresponding to the Medicare ambulatory surgical center ("ASC") methodology. Outpatient surgeries not classified into the nine Medicare designated groups will be classified by OMPP into one of the ASC groups or additional payment groups. Reimbursement will be based on a blended rate equal to 50% of the Medicare ASC rate and 50% of the fiscal year 1992 Indiana Medicaid statewide median allowed amount for that service.
Emergency care payment will be based on a statewide fee schedule. The fee schedule amount will be equal to the Indiana Medicaid statewide median amount paid per service during fiscal year 1992.
Nonemergency care, as determined by the Office of Medicaid Policy and Planning ("OMPP"), that is provided in an emergency room shall be paid based upon a nonemergency (for example, a clinic) fee schedule established by OMPP. This fee schedule amount will be equal to the Indiana Medicaid statewide median amount paid per service during fiscal year 1992.
Reimbursement for laboratory procedures and the technical component of radiology procedures shall be based on 95% of the Medicare allowance that was in effect prior to federal adoption of the Resource Based Relative Value Scale ("RBRVS") for Medicare services.
Finally, reimbursement allowances for all outpatient hospital procedures not addressed elsewhere in the new rule will be equal to the Indiana Medicaid statewide median amount paid per service during fiscal year 1992.
The State has determined that the fiscal impact of the new rule, changing the reimbursement system for outpatient hospital Medicaid services from a provider specific rate to a fixed fee schedule, will be a reduction in the aggregate expenditure for these services equal to a minimum of 10%, or a $27.3 million savings for the Medicaid program.
Physicians participating in the Indiana Medicaid program prior to implementation of the new rules were reimbursed based on the lower of: (1) submitted charges; (2) usual and customary charges, as determined by the billing profile of the individual provider; or (3) a prevailing fee schedule rate based upon a profile of charges according to the geographic location and medical specialty of the provider.
The new rule establishes a revised reimbursement methodology which will use a statewide standardized fee schedule for the payment of medical services. Under the new rule reimbursement for physician's services (other than anesthesiologists and assistant surgeons) shall be equal to the lower of: (a) 95% of the Medicare allowance for that procedure that was in effect prior to the federal adoption of the RBRVS methodology for Medicare services; or (b) the Indiana Medicaid *1317 average allowed amount for that procedure in fiscal year 1992. If no Medicare allowance exists, reimbursement is to be equal to the Indiana Medicaid average allowed amount for that procedure in fiscal year 1992.
The State has determined that the fiscal impact of the proposed physician reimbursement system will be a reduction in the aggregate expenditures for physician services of approximately $23.2 million.

The Complaint
On December 21, 1993, the Plaintiffs filed a five count Complaint seeking a determination in the form of declaratory and injunctive relief that the adoption and implementation of the new rules is in violation of federal law.
Count one of the Complaint charges that, in adopting the new rules, Defendants failed to comply with the procedural requirements of various provisions of the Medicaid Act and the federal implementing regulations concerning public notice and consultation with a medical care advisory committee. Count one also alleges that the new rules do not contain an appeals mechanism in violation of federal regulations.
Counts two and three charge that the new rules do not assure that reimbursement for Medicaid physician and hospital services will allow Medicaid beneficiaries in the City of Gary reasonable access to medical care, and that the new rules will reduce the physician and hospital services available to Medicaid beneficiaries in the City of Gary so that such services will not be available at least to the extent available to the general population, as required by the equal access provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A), and other statutory sections and regulations.
Count four alleges that the reimbursement rate provided under the new rules for medical services is not adequate to cover the reasonable and necessary costs incurred by Plaintiffs in providing these services, and therefore constitutes a taking of property without due process of law, in violation of the due process clause of the Fourteenth Amendment to the United States Constitution.
Count five alleges that the reimbursement rates established by the new rules will restrict the quantity, quality, and access to services of Medicaid patients and will result in a disparate impact on minority Medicaid recipients in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and in violation of this Court's consent decree previously entered in Cause Nos. H76-373 and H77-154.

DISCUSSION
When deciding a motion to dismiss, this Court must assume the truth of a plaintiff's well-pleaded factual allegations, making all possible inferences in the plaintiff's favor. Prince v. Rescorp Realty, 940 F.2d 1104, 1106 (7th Cir.1991); Janowsky v. United States, 913 F.2d 393, 395 (7th Cir.1990). This Court may not dismiss a plaintiff's complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); see also Barnhart v. United States, 884 F.2d 295, 296 (7th Cir.1989), cert. denied, 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990). In order to prevail, the Defendant must demonstrate that "the plaintiff's claim, as set forth by the complaint, is without legal consequence." Gomez v. Illinois State Bd. of Educ., 811 F.2d 1030, 1039 (7th Cir.1987).
Defendants alternatively move for summary judgment under Federal Rule of Civil Procedure 56, and have submitted an affidavit and supporting documentation. Federal Rule of Civil Procedure 12(b) provides in part:
If on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated for one of summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunities to present all material made pertinent to such a motion by Rule 56.
As Defendants in the instant case move to dismiss the Complaint, but rely on evidence which is outside the pleadings, the Motion *1318 will be treated as a motion for summary judgment.
Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); First Wis. Trust Co. v. Schroud, 916 F.2d 394, 398 (7th Cir.1990). In other words, the record must reveal that no reasonable jury could find for the nonmovant. Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 335 (7th Cir.1991); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the Court must read all facts in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255, 106 S.Ct. at 2513; Richardson v. Penfold, 839 F.2d 392, 394 (7th Cir.1988).
The burden is upon the moving party to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, which it believes demonstrates an absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S.Ct. at 2553. Once the moving party has met this burden, the nonmoving party may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir.1990); Schroeder v. Lufthansa German Airlines, 875 F.2d 613, 620 (7th Cir.1989). "Whether a fact is material depends on the substantive law underlying a particular claim and `only disputes over facts that might effect the outcome of the suit under governing law will properly preclude the entry of summary judgment.'" Walter v. Fiorenzo, 840 F.2d 427, 434 (7th Cir.1988) (citing Anderson, 477 U.S. at 248, 106 S.Ct. at 2510).
"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." Beard v. Whitley County REMC, 840 F.2d 405, 410 (7th Cir. 1988). Therefore, if a party fails to establish the existence of an essential element of its case on which it bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "`no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323, 106 S.Ct. at 2552. With these standards in mind, the Court now turns to the substance of the Plaintiffs' claims.

Availability of Injunctive Relief
The first argument which is considered by the Court was actually an afterthought to Defendants. In their Supplemental Memorandum in Support of their Motion to Dismiss, filed March 17, 1994, Defendants contend that Plaintiffs are not entitled to injunctive relief in this action as there is an adequate remedy at law for their claims through Indiana administrative processes which provide the opportunity for compensation to Medicaid providers for past underpayments. Defendants further argue that if the Court dismisses Plaintiffs' claims for injunctive relief it should also dismiss their claims for declaratory relief.
Plaintiffs oppose the motion on both grounds. They maintain that the state administrative procedures at issue do not permit an action challenging the legality of reimbursement rates, and that even if such a suit is permitted under the state law scheme, only an adequate federal legal remedy will make injunctive relief unavailable in a federal court. Finally, the Plaintiffs contend that even if their claims for injunctive relief are dismissed, this action may not be dismissed, as their claims for declaratory relief remain viable.
"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959); see *1319 also Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 57, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975); Northern Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 105 S.Ct. 459, 83 L.Ed.2d 388 (1984) (Renquist, Circuit Justice) ("A party seeking an injunction from a federal court must invariably show it does not have an adequate remedy at law."). This rule is equally applicable to permanent as well as preliminary injunctive relief. See Walgreen Co. v. Sara Creek Property Co., 966 F.2d 273, 275 (7th Cir. 1992); New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir.1989); Int'l Union, UAW v. Mack Trucks, Inc., 820 F.2d 91, 95 (3d Cir.1987).
As Defendants point out, whether Plaintiffs have a legal remedy that will enable them to recover the income they will lose if the new rules are not enjoined, and they receive reimbursement at the rates set within those rules, determines whether injunctive relief may be granted. "[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." Sampson v. Murray, 415 U.S. 61, 90, 94 S.Ct. 937, 952-53, 39 L.Ed.2d 166 (1974). It is clear that Plaintiffs do not have such an adequate remedy at law in this Court because the Eleventh Amendment bars federal courts from awarding retrospective money judgments against the states. Edelman v. Jordan, 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974). The question is whether an adequate remedy at state law is a barrier to injunctive relief in federal court.
In Coalition of Michigan Nursing Homes, Inc. v. Dempsey, the district court declined to issue injunctive relief to Medicaid providers claiming inadequate reimbursement on the basis that the providers could challenge the adequacy of state reimbursement rates in the state court of claims. 537 F.Supp. 451, 464 (E.D.Mich.1982). The Seventh Circuit approvingly referenced this decision in Hillhaven Corp. v. Wisconsin Dept. of Health and Social Services, 733 F.2d 1224 (1984), stating that a consideration as to whether injunctive relief could be granted to a Medicaid provider challenging the constitutionality of a Wisconsin statute which delayed any increase in Medicaid reimbursement rates was whether the State of Wisconsin had waived sovereign immunity and provided an appeals mechanism by which providers could recover retroactive payments to which they claimed an entitlement. 733 F.2d at 1226. However, the court expressly noted that discussion of this issue was dicta, as the plaintiff had failed to satisfy the threshold requirement for obtaining equitable relief, likelihood of success on the merits. Id.
Because this dicta is not easily reconciled with the law of the Supreme Court, this Court declines to follow the suggestion of the Seventh Circuit in Hillhaven that a federal district court look to the adequacy of a state court remedy in assessing whether a plaintiff is entitled to equitable relief in federal court. "It is settled that no adequate remedy at law exists, so as to deprive federal courts of equity jurisdiction, unless it is available in the federal courts." Petroleum Exploration, Inc. v. Public Service Comm'n of Kentucky, 304 U.S. 209, 217, 58 S.Ct. 834, 839, 82 L.Ed. 1294 (1938). "[T]he inadequacy prerequisite to the relief in a federal court of equity is measured by the character of remedy afforded in federal rather than in state courts of law." Di Giovanni v. Camden Fire Ins. Ass'n, 296 U.S. 64, 69, 56 S.Ct. 1, 3, 80 L.Ed. 47 (1935).
Whether a suitor is entitled to equitable relief in the federal courts, other jurisdictional requirements being satisfied, it is strictly not a question of jurisdiction in the sense of the power of a federal court to act. It is a question only of the merits; whether the case is one for the peculiar type of relief which a court of equity is competent to give. [citation omitted] If a plaintiff is entitled to be heard in the federal courts he may resort to equity when the remedy at law there is inadequate, regardless of the adequacy of the legal remedy which the state courts may afford.
Id. See also Alabama Pub. Serv. Comm'n v. Southern Ry. Co., 341 U.S. 341, 360-61, 71 S.Ct. 762, 773-74, 95 L.Ed. 1002 (1951) (J.J. Frankfurter and Jackson, concurring). "There is no warrant in the decisions of this court for saying that the plaintiff has an `adequate remedy at law' merely because he may bring suit in the state courts." United *1320 States v. State of New York, 708 F.2d 92, 93 (2d Cir.1983).
As Defendants point out, it can no longer be maintained in unqualified form that an adequate remedy at state law is not a valid ground for refusal to issue a federal injunction. See In re Special March 1981 Grand Jury, 753 F.2d 575, 581 (7th Cir.1985). This is a result of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which holds that state law criminal proceedings cannot be enjoined on federal constitutional grounds by a federal district court where the federal plaintiff has an adequate remedy at law to assert his federal claim by way of defense to the prosecution. Younger v. Harris, 401 U.S. at 46, 91 S.Ct. at 751. The Younger doctrine has since been extended to state civil proceedings that are punitive in character, such as to attach assets acquired in violation of state criminal law, Trainor v. Hernandez, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), or to discipline a lawyer, Middlesex County Ethics Comm'n v. Garden State Bar Ass'n, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). While the Younger doctrine may, as the Seventh Circuit has commented, qualify the broad principle that federal courts may only look to federal law in determining the adequacy of a litigant's remedy at law, by its own terms, the doctrine is only applicable where the federal court is asked to enjoin an ongoing state court proceeding. The question which the federal court must consider is whether the plaintiff has an adequate remedy in the state court proceeding whereby he may raise his federal claims, which, under the Younger doctrine, would preclude an injunction. The decisions of the Seventh Circuit which have shed light on the qualification of the general proposition that a federal court may only look to the adequacy of a federal remedy in assessing the need for an injunction, say no more. See generally, In re Special March 1981 Grand Jury, 753 F.2d at 581; Lynk v. LaPorte Superior Court No. Two, 789 F.2d 554, 559 (7th Cir.1986).
As there is no contemporaneous state court proceeding in which the issues before this Court are raised, and which the Plaintiffs seek to enjoin, the Younger doctrine is inapplicable, and so is the qualification that it imposes on the proposition that a federal court may only look to the adequacy of the plaintiff's federal remedy in assessing the availability of injunctive relief. As it is clear that the Plaintiffs do not have an adequate remedy at federal law in this action due to the Eleventh Amendment barrier to compensatory relief, Defendants claim that injunctive relief is unavailable is rejected. Plaintiffs are not precluded from seeking relief in this Court. Defendants' contention that this action should be dismissed because the Plaintiffs are not entitled to injunctive relief is rejected. The Court will consider the substance of the Plaintiffs' claims.

Count One  Procedural Requirements
As Defendants point out, there is no statute expressly conferring a private right of action to enforce the statutory sections and regulations Plaintiffs rely upon in Counts One, Two and Three of their Complaint. However, as indicated by the jurisdictional statement of paragraph two of Plaintiff's Complaint, this action is based upon purported violations of federal statutes and regulations which are enforceable under 42 U.S.C. section 1983. The threshold question then, is whether Plaintiffs' claims under Counts One, Two, and Three, that the new rules violate various provisions of the Medicaid statute and its implementing regulations, state a cause of action under section 1983.
Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C.A. § 1983 (West 1981). In Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980), the Supreme Court held that section 1983 provides a cause of action for violations of rights that are defined by federal statutes as well as those defined in the Constitution. In Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), the Supreme Court established a framework for analyzing section 1983 enforceability questions. This framework was employed by the Supreme Court in Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 110 S.Ct. 2510, 110 *1321 L.Ed.2d 455 (1990), where it was held that the Boren Amendment to the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A), conferred rights enforceable under section 1983 to Medicaid providers. The framework is a two-step inquiry. "First, the plaintiff must assert the violation of a federal right." Golden State Transit, 493 U.S. at 106, 110 S.Ct. at 448. "Section 1983 speaks in terms of `rights, privileges, or immunities,' not violations of federal law." Id. For this first step, the Plaintiff asserting a federal right has the burden. Id. The factors which bear on the resolution of this question include: (a) whether the provision in question was intended to benefit the putative plaintiff; (b) whether the statute creates a binding obligation on the state government as opposed to merely expressing a congressional preference for certain kinds of treatment; and (c) whether the interest asserted by the plaintiff is sufficiently specific and definite to be within the competence of the judiciary to enforce. Id.; see also Wilder, 496 U.S. at 509, 110 S.Ct. at 2517; Miller v. Whitburn, 10 F.3d 1315, 1319 (7th Cir.1993); Arkansas Medical Soc'y, Inc. v. Reynolds, 6 F.3d 519, 523 (8th Cir.1993).
In the second step, once the Plaintiff has asserted a federal right, the court must determine whether Congress "specifically foreclosed a remedy under section 1983." Golden State Transit, 493 U.S. at 106, 110 S.Ct. at 448. On this point, the defendant bears the burden to show that Congress has provided a comprehensive enforcement mechanism within the statute in question, so as to make enforcement under section 1983 inconsistent with the federal scheme. Id. at 106-07, 110 S.Ct. at 448-49; see also Arkansas Medical Soc'y, 6 F.3d at 523.[2]
Count One of Plaintiffs' Complaint alleges that Defendants failed to provide the procedural *1322 protections to Medicaid providers mandated by federal law and regulations. This count alleges that the procedures undertaken by Defendants in promulgating the new rules were deficient on more than one ground. Plaintiffs allege that the new rules were adopted and promulgated without proper public notice in violation of 42 C.F.R. section 447.205 (¶ 100); that the new rules were adopted and promulgated without the advice and input of a medical care advisory committee, in violation of 42 U.S.C. section 1396a(a)(4) (¶ 101); that the new rules do not contain an appeals mechanism in violation of 42 C.F.R. section 447.253(e) (¶ 102); and that because the new rules were adopted and promulgated contrary to the procedures required by the federal Medicaid Act and implementing regulations, they violate the supremacy clause of Article VI of the United States Constitution.
Initially, the Court must agree with Defendants that the supremacy clause of its own force does not create rights enforceable under section 1983. "That clause is not a source of any federal rights; it secures federal rights by according them priority whenever they come in conflict with state law." Golden State, 493 U.S. at 107, 110 S.Ct. at 449 (citations and internal quotes omitted).
The other claims asserted by Plaintiffs' Count One are not so easily disposed of. Defendants seek dismissal of the Plaintiffs' claims concerning violations of Medicaid regulations asserted in Count One on the ground that these regulations do not create rights enforceable under 42 U.S.C. section 1983.
Defendants argue that agency regulations in general, and specifically the regulations relied upon by Plaintiffs, cannot independently create federal rights enforceable under section 1983. For their part, Plaintiffs do not seem to object to this assertion. Rather, they claim that the regulations they rely upon can be used to define the scope of the rights created under the Medicaid Act.
Both sides rely upon Wright v. Roanoke, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), wherein the Supreme Court held that tenants of low-income housing projects who claimed utility overcharges had a private cause of action under section 1983. 479 U.S. at 422-24, 107 S.Ct. at 769-71. The applicable statute in that case, the Brooke amendment to the United States Housing Act of 1937, 42 U.S.C. § 1437a, imposed a ceiling for rents charged to tenants of low-income public housing projects, stating that a low-income family "shall pay as rent" a specified percentage of its income. Plaintiffs asserted that the public housing authority had exceeded this ceiling by overbilling them for utilities. The defendant contended that the statute did not include utilities as part of the rent. However, a Housing and Urban Development ("HUD") regulation defined "rent" as including utilities. Therefore, the court held that the plaintiffs could state a cause of action under section 1983 to challenge the utility overcharge by asserting a violation of their rights guaranteed by the statute and implementing regulation. Thus, although Wright does not support the broad proposition that federal regulations alone may create rights enforceable under section 1983, it does support the proposition that courts may look to administrative regulations to define the scope of rights created by statute. Wright, 479 U.S. at 429-30, 107 S.Ct. at 773-74. See also Oklahoma Nursing Home Ass'n v. Demps, 792 F.Supp. 721, 726 (W.D.Okla. 1992).
Defendants argue that the regulations relied upon by the Plaintiffs, the public notice regulation at 42 C.F.R. section 447.205, and the provider appeal regulation at 42 C.F.R. section 447.253(e), do not define the scope of rights created by statute, and therefore do not satisfy the first prong of the Golden State Transit test, that Plaintiffs allege a violation of a federally secured right.
While it is a novel question as to whether these provisions create federally enforceable rights, this Court is not the first to address these issues. 42 C.F.R. section 447.205(a) requires a state Medicaid agency to "provide public notice of any significant proposed change in its methods and standards for setting payment rates for services." Subsection (c) specifies the content of this notice, stating that it must describe the proposed change in methods and standards, give an estimate of any expected increase or decrease *1323 in annual aggregate expenditures, and explain why the agency is changing its methods and standards. See 42 C.F.R. § 447.205(c).
In Oklahoma Nursing Home Ass'n v. Demps, 792 F.Supp. at 726-27, the court held that the public notice regulation at issue granted rights enforceable under section 1983 to health care providers as the provision defined and implemented the sections of the Medicaid Act which require state Medicaid plans to "provide such methods and procedures ... as may be necessary ... to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers;"[3] and which further require states to provide "procedures to make available to the public the data and methodology used in establishing payment rates from nursing facilities...."[4] The court noted that these statutory requirements imposed upon the states grant rights to health care providers as defined and implemented by the public notice regulation, which specifies how changes in Medicaid rates are to be made available to the public. Id. at 727. Discussing these statutory sections, as well as 42 C.F.R. section 447.205, the court stated:
The applicable sections of the Act, as well as the regulation, are stated in mandatory and not merely precatory terms. The public notice regulation and the statutory sections upon which the regulation is based are essential parts of, and help to implement, the right of health care providers to reasonable and adequate Medicaid reimbursement rates. The public notice regulation is sufficiently grounded in the recognized statutory rights of health care providers under the Medicaid Act to state a cause of action under section 1983.
Id. at 727.
The same conclusion was reached in Morabito v. Blum, 528 F.Supp. 252, 270 (S.D.N.Y. 1981), wherein the court concluded that the public notice provision of 42 C.F.R. section 447.205 should not be read so narrowly as to only confer rights upon Medicaid providers, but also as to confer rights in favor of Medicaid recipients. The court held that the named plaintiffs, Medicaid recipients and associations containing Medicaid recipients, had standing to assert the state's failure to comply with section 447.205.
The case relied upon by Defendants, Kansas Hosp. Ass'n v. Whiteman, 835 F.Supp. 1556 (D.Kan.1993), is inapposite, as it does not address the existence of a right under section 1983 to enforce the notice provision of section 447.205. Rather, that case holds that the notice requirement of section 447.205 is inapplicable to the imposition of co-payments by a state's Medicaid plan, and that even if the regulation were applicable, public notice provided by the defendants in Whiteman was sufficient to satisfy its notice requirement. The case does not address whether the plaintiffs could assert a cause of action under section 1983 for failure to comply with that provision. Accordingly, the Court concludes that the notice provision of 42 C.F.R. section 447.205 confers rights enforceable under section 1983, and therefore satisfies the first prong of the Golden State Transit test. The regulation is intended to benefit the Plaintiffs in this action, Medicaid providers, by giving them notice of significant changes in state law which affect them directly. The regulation is stated unambiguously in mandatory terms, and provides a binding obligation on state government to comply with its terms. Finally, Plaintiffs' interests in receiving notice of significant changes in the state's Medicaid plan, as set forth in section 447.205, are sufficiently specific and definite to be within the competence of the judiciary to enforce. It merely requires this Court to compare the specific provisions of that regulation to the conduct of the Defendants in this case.
The second prong of the Golden State Transit test requires this Court to consider whether Congress has foreclosed private enforcement of this regulation by providing a comprehensive remedial scheme within the law itself. Golden State Transit, 493 U.S. at 106-07, 110 S.Ct. at 448-49. On this point, the Defendants carry the burden, Id., and they have not shown the Court any evidence *1324 that Congress intended to foreclose private enforcement of the public notice requirement. Defendants have not argued that there exists any comprehensive remedial scheme to address a state's failure to comply with its obligation to provide notice to the public of any significant proposed change in its methods and standards for setting payment rates. Accordingly, the public notice regulation, 42 C.F.R. § 447.205 is enforceable by Plaintiffs under 42 U.S.C. § 1983.
The Court must next consider whether the Plaintiffs have a right enforceable under section 1983 to assert the violation of 42 U.S.C. section 1396a(a)(4). Plaintiffs allege that the new rules were adopted and promulgated without the advice and input of a medical care advisory committee in violation of 42 U.S.C. section 1396a(a)(4). In relevant part, that section provides that a state medical plan for assistance must "provide such methods of administration (... including provision for utilization of professional medical personnel in the administration ... of the plan) as are found by the Secretary to be necessary for the proper and efficient operation of the plan...." 42 U.S.C.A. § 1396a(a)(4) (West Supp.1994). This statutory section does not specifically require the advice and input of a medical care advisory committee. However, the implementing regulation, 42 C.F.R. section 431.12, provides in part that "a state plan must provide for a medical care advisory committee meeting the requirements of this section to advise the Medicaid agency director about health and medical care services;" and that "the committee must have an opportunity for participation in policy development and program administration, including furthering participation of recipient members in the agency program." 42 C.F.R. §§ 431.12(b) and (e).
Recently, in Kansas Hosp. Ass'n v. Whiteman, 835 F.Supp. 1556, the court expressly declined to follow other district courts, and held that the regulation at issue did not convey independent rights to the Medicaid provider plaintiffs that could be enforced under 42 U.S.C. section 1983. The court concluded that because the statutory section, 42 U.S.C. section 1396a(a)(4), only requires that states make certain provisions in their plans for utilization of professional medical personnel in the administration of the plan, and for the employment of Medicaid recipients and other low income persons in administering the plan and assisting any advisory committee's established by the state agency, the statute itself did not create a judicially enforceable right on the part of the individual plaintiffs to require that a medical care advisory committee be consulted. 835 F.Supp. at 1573-74. This holding was in direct conflict to that in Oklahoma Nursing Home Ass'n, where the court held that the regulation defined the statutory mandate in 42 U.S.C. section 1396a(a)(4) that a state plan provide for the utilization of professional medical personnel in the operation of the plan. The court held that "the statute, as defined and implemented by the regulation, is an integral part of the plaintiff's enforceable, procedural right to have Medicaid reimbursement rates accompanied by findings and assurances of reasonableness and adequacy." Oklahoma Nursing Home Ass'n, 792 F.Supp. at 727. See also Morabito v. Blum, 528 F.Supp. at 266 (Medicaid recipients may bring a section 1983 action in federal court to challenge noncompliance with medical care advisory committee regulation); Becker v. Toia, 439 F.Supp. 324, 333 (S.D.N.Y.1977) (Medicaid beneficiaries may challenge failure to consult with medical care advisory committee).
The Court agrees with the weight of authority that the statute and its implementing regulations create an enforceable right in favor of Medicaid providers to challenge the failure of state officials to consult with a medical care advisory committee prior to the promulgation of new or changed Medicaid reimbursement rates. Defendants have not shown the Court that Congress has precluded enforcement under section 1983 by providing a comprehensive enforcement mechanism within the Medicaid statute to ensure compliance with the medical care advisory committee consultation requirement. Accordingly, Plaintiffs Complaint states a cause of action under section 1983 on this claim.
Finally, in Count One Plaintiffs allege that the new rules do not contain an appeals mechanism in violation of 42 C.F.R. *1325 section 447.253(e). The Medicaid Act requires states participating in the Medicaid program to
provide for procedures of prepayment and post-payment claims review, including review of appropriate data with respect to the recipient and provider of a service and the nature of the service for which payment is claimed, to ensure the proper and efficient payment of claims and management of the program.
42 U.S.C.A. § 1396a(a)(37)(B) (West Supp. 1994). The implementing regulation, 42 C.F.R. section 447.253(e), provides that
the Medicaid agency must provide an appeals or exception procedure that allows individuals providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates.
As with the other rights asserted by Plaintiffs in this action, the appeals mechanism regulation provides specific and definite rights in favor of Medicaid providers to challenge payment rates, and to submit additional evidence and receive prompt administrative review. The Medicaid Act and its implementing regulations require in clear and mandatory terms that such a procedure is provided by the state. The Defendants have offered no evidence that Congress has specifically foreclosed the Plaintiffs' right to challenge the failure to include an appeals mechanism as required by the Medicaid Act and its implementing regulations. Accordingly, enforcement of this provision under section 1983 is not inconsistent with the federal scheme, and Plaintiffs have stated a cause of action on this claim. As this Court has determined that Plaintiffs may proceed with the claims contained in Count One of the Complaint, it is now incumbent upon the Court to consider the merits of those claims. However, it must first be decided what evidence will inform the Court's decision.

Plaintiffs' Motion to Strike the Declaration of James M. Verdier
Plaintiffs move to strike the declaration of James M. Verdier, submitted in support of Defendants' Motion for Summary Judgment. Their argument is two fold. First, Plaintiffs claim that documents submitted as exhibits to the affidavit are neither sworn nor certified, and therefore unauthenticated under Federal Rule of Evidence 901(a). Federal Rule of Evidence 901(b)(7) states that "evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept," is sufficient authentication conforming with the requirements of Rule 901(a).
In opposition to Plaintiffs' motion to strike the declaration of James M. Verdier, Defendants acknowledge that the first declaration contained unauthenticated documents as exhibits, but contend that they have submitted a supplemental declaration of James M. Verdier which resolves this problem. The Court agrees. Accordingly, Plaintiffs' first contention is remedied by the supplemental declaration which contains authenticated documents.
Plaintiffs' second contention in their motion to strike the declaration of James M. Verdier is that the declaration contains "selfserving declarations, hearsay, and conclusions based on data that is not before the Court." Plaintiffs complain specifically about paragraphs 7, 8, 9, 10, and 11 of the original declaration in which Verdier describes the procedures undertaken by the state agency in adopting the new rules governing Medicaid reimbursement. Plaintiffs object to Verdier's conclusions contained in these paragraphs based upon the data considered by the state agency which is not presently before the Court. For example, in paragraph 7 Verdier states: "Our data indicated that while the ratio of Medicaid-eligible recipients to Medicaid participating providers in 1992 was 213 to 1, the ratio of the total general population to total physicians in the state was 1,440 to 1." (Verdier Decl. ¶ 7) They also object to his characterization of the determinations made by the state agency as hearsay. In paragraph 8 the Plaintiffs object to Verdier's characterization that "we concluded that access for Medicaid recipients would not be impaired by reducing the rates to bring them *1326 more in line with those paid by other payers and states." (Verdier Decl. ¶ 8) In paragraph 9 Plaintiffs object to Verdier's statement that "because reimbursement for these primary care maternity services was not affected by the new rules, we determined that access to these fundamental services would not be impaired." (Verdier Decl. ¶ 9) Plaintiffs object to Verdier's conclusion in paragraph 10 that the state agency determined that the new rates would not impair access for Medicaid recipients in the City of Gary.
Federal Rule of Civil Procedure 56(e) states, in pertinent part:
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.
"It is the policy of Rule 56 to allow the affidavit to contain evidentiary matter, which if the affiant were in court and testifying on the witness stand, would be admissible as part of his testimony." American Security Co. v. Hamilton Glass Co., 254 F.2d 889, 893 (7th Cir.1958).
"The evidence need not be in admissible form, affidavits are ordinarily not admissible evidence at a trial. But it must be admissible in content, in the sense that a change in form but not in content, for example a substitution of oral testimony for a summary of that testimony in an affidavit, would make the evidence admissible at trial." Winskunas v. Birnbaum, 23 F.3d 1264, 1267-68 (7th Cir.1994).
Mr. Verdier's declaration is a statement of the testimony he would give if called as a witness in this case. As the Assistant Secretary of Medicaid Policy and Planning he would be able to testify to the content of studies conducted by the state agency prior to adoption of the new rules, and could be cross-examined on the facts, figures, and conclusions of his testimony. There is nothing improper about his declaration which would lead this Court to disregard its contents in ruling on this summary judgment motion. Accordingly, the Plaintiffs' Motion to Strike the declaration of James Verdier is DENIED.

Summary Judgment as to Count One
In their initial response to Defendants' summary judgment motion, the Plaintiffs contended that summary judgment would be premature at such an early stage of the pleadings, as discovery had not been completed. However, relying on the affidavits and factual materials attached to their Motion for Temporary Restraining Order and Complaint, as well as on the Defendants' own factual materials attached to the declaration of James M. Verdier, the Plaintiffs argued that questions of material fact exist which preclude summary judgment. Additionally, on April 5, 1994, the Plaintiffs filed their Supplemental Memorandum and Designation in opposition to Defendant's Motion for Summary Judgment, wherein they submitted excerpts from the deposition of James Verdier in opposition to the Motion for Summary Judgment. Accordingly, the Motion has been fully briefed, and the Court will address the Defendants' request for summary judgment.
It is the task of this Court to determine whether Defendants have shown that there is no genuine issue of material fact as to the three issues presented in Count One of the Complaint. First, the Defendants maintain that no genuine issue of material fact exists as to whether they have complied with the public notice requirement of 42 C.F.R. section 447.205. Part (a) of that regulation states that "the agency must provide public notice of any significant proposed change in its methods and standards for setting payment rates for services." 42 C.F.R. § 447.205(a). Obviously, as evidenced by the uncontested facts, Defendants have provided notice to Plaintiffs. Plaintiffs concede as much in their response to the Defendants' Motion for Summary Judgment. However, it must still be determined whether the notice is in compliance with subsection (c) of 42 C.F.R. section 447.205 which specifies the necessary content of the public notice.
There are six subparts to subsection (c). Subpart (1) mandates that Defendants describe the proposed change in methods and standards used to formulate the new reimbursement methodology. Exhibit "B" to the *1327 declaration of James Verdier is the notice of public hearing on the proposed new rules for outpatient hospital services and physicians and other practitioner services. Exhibit "A" to the supplemental declaration of James Verdier contains the notice of public hearing for the new rule to establish interim reimbursement policies for inpatient hospital services. Both notices describe the proposed changed in methods and standards as specified by 42 C.F.R. section 447.205(c)(1). As to the new rule regarding inpatient hospital services, the public notice states that OMPP "has developed a revised reimbursement methodology which will establish prospective, per diem rates for the payment of inpatient hospital services provided to Medicaid recipients." The notice of public hearing goes on to state:
The revised methodology establishes per diem payment rates for payment of each facility. The per diem payment rate provides for an all-inclusive rate for each patient day of service. Payment rates are established by assigning each facility to a group of facilities with defined related characteristics. A per diem base year payment rate for each peer group is established, based on the facilities' allowable costs for fiscal year 1990, and inflated to the midpoint of fiscal year 1994, using a published hospital marker basket inflation index.
Facilities with per diem base year costs below the per diem base year rate for the applicable peer group will be reimbursed at the facilities' base year per diem costs, as inflated from the facilities' fiscal year 1990 reporting period to the midpoint of state fiscal year 1994 based on the hospital market basket inflation index.
There will be no cost settlement under the revised reimbursement methodology. The Office will review rates annually to determine the need for updating rates.
The notice of public hearing for the new rules on outpatient hospital services and physician and other practitioner services states that OMPP has developed a revised reimbursement methodology which will establish fixed fee schedule allowances for the payment of outpatient hospital services. The notice goes on to describe the proposed change in methods and standards as follows:
Fee schedule amounts will be established for each allowable outpatient service. For out-patient surgical procedures, rates will be based upon the Medicare Ambulatory Surgical Center (ASC) methodology.
Outpatient surgeries which are not classified into the nine groups designated by medicare will be classified by IFSS into one of those nine groups or addition payment groups. Payment will be established based on the median statewide payment amount. Hospitals will bill for surgeries using a HCPCS code. Nonemergency care services will be reimbursed at a "nonemergency" rate. Conversely, emergency services will be reimbursed at a statewide "emergency" rate. Laboratory and radiology procedures will be reimbursed based on the Medicare fee schedule. All other outpatient hospital service allowed payment rates will be based upon an analysis of current statewide charge and payment amounts.
There will be no year-end cost settlement under the revised reimbursement methodology. The Office will review rates annually to determine the need for updating rates.
As to reimbursement for physician and other practitioner services, the notice of public hearing states that "the office of Medicaid policy and planning has developed a revised reimbursement methodology which will use a statewide standardize fee schedule for the payment of medical services."
The Court concludes that these descriptions of the proposed change in methods and standards used to calculate Medicaid reimbursement and rates are sufficient to comply with the language of 42 C.F.R. section 447.205(c)(1). The descriptions specify the changes made in the methodology in calculating reimbursement rates. The regulation requires no more. There can be no argument that the other subparts of 42 C.F.R. section 447.205(c) have been satisfied. As required by subpart (2), the notice gives an estimate of the expected decrease in annual aggregate expenditures. As required by subpart (3), *1328 the notice explains the agency's motivation in changing its methods and standards. As required by subpart (4), the notice identifies the local agency in every county in which copies of the proposed changes are available. As required in subpart (5), the notice gives an address where written comments may be sent and reviewed by the public, and as required by subpart (6), the notice specifies the location, time, and date that a public hearing on the proposed new rules will be held.
Additionally, the Court notes that since compliance with this regulation can be determined by examining the public notice which was afforded, there are no other facts which are material to this determination. Defendants have complied with the mandate of 42 C.F.R. section 447.205, and there can be no genuine issue of material fact. Accordingly, summary judgment is GRANTED to Defendants on this issue.
The Court next considers Defendants' request for summary judgment as to the Plaintiffs' second claim in Count One, that Defendants have not complied with 42 U.S.C. section 1396a(a)(4). As noted above, this section contains no requirement that a state confer with a medical care advisory committee prior to implementation of new Medicaid rules. Rather, this requirement is contained in the statute's implementing regulation, 42 C.F.R. section 431.12(e), which states that "the committee must have opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program."
"The cases are unanimous that, where consultation with the medical care advisory committee is required, the committee's input must be sought and received before the state action in question, and not after the fact." Morabito v. Blum, 528 F.Supp. at 264 (citations omitted). "Under the regulation, the [medical care advisory committee] should have the opportunity to consider and discuss the available alternative policies, not merely the chance to make minor suggestions concerning a single policy already adopted by the state." Burgess v. Affleck, 683 F.2d 596, 599 (1st Cir.1982) (citations omitted); see also Morgan v. Cohen, 665 F.Supp. 1164, 1179 (E.D.Pa.1987).
The declaration of James Verdier states in paragraph 3 that the reimbursement reform proposals eventually codified in the new rules were presented to the Medicaid Advisory Committee on at least three separate occasions: March 11, 1993; June 18, 1993; and August 17, 1993. Copies of the minutes of the June 18, and August 17, 1993, meetings are attached to the declaration as Exhibits "C" and "D". Additionally, Exhibit "E" of the declaration is a copy of a memorandum sent by James Verdier to the Medicaid Advisory Committee, dated July 14, 1993, which informs the members that the new rules will appear in the August 1, 1993, Indiana Register.
Defendants contend that these documents show that they satisfied their duty under the Medicaid statute and regulation to consult with the advisory committee prior to the drafting and promulgation of the new rules. The minutes of the Medicaid Advisory Committee meeting of June 18, 1993, discuss hospital and physician reimbursement reforms initiated by OMPP. The minutes reveal a lengthy discussion of this issue between James Verdier and members of the Medicaid Advisory Committee. As the rules were not promulgated until August 1, 1993, it is evident from these minutes that the Medicaid Advisory Committee was consulted prior to meaningful state action in promulgating and implementing new Medicaid rules.
Contemporaneous with the Governor's announcement of the new rules on July 14, 1993, all members of the Medicaid Advisory Committee were sent the memorandum attached as Exhibit "E" to the Declaration of James Verdier. The memorandum included summaries of all the new rules and informed the members of the committee that the full text of the rules would appear in the August 1, 1993, Indiana Register. Subsequently, on August 17, after the rules had been proposed, but prior to the scheduled public hearings, the committee had another chance to review and comment on the new rules. Following review of the comments received during the meeting of the Medicaid Advisory Committee, and at the public hearings, Mr. *1329 Verdier recommended to Ms. Sullivan that she approve the proposed rules.
Plaintiffs do not deny these facts, but rather, argue that the participation of the committee was insufficient to comply with the regulations requiring that it be consulted prior to significant program or policy changes. See 42 C.F.R. § 431.12(e); Morgan v. Cohen 665 F.Supp. at 1179. Because the Court finds that the participation of the Medicaid Advisory Committee was sufficient to comply with federal law, it must reject the Plaintiffs' contentions. The committee was consulted, and had the opportunity to consider and comment upon the proposed rules, both before and after they were announced, and well before they were finally approved. This participation is well documented, and nothing more is required. See Burgess v. Affleck, 683 F.2d at 599. There is simply no support for Plaintiffs' assertion that "committee members were not afforded the opportunity to discuss [the new rules] or offer advice." (Plaintiffs' Supp.Mem. at p. 2.) Accordingly, it has not been shown that there is a genuine issue of material fact regarding Defendants' compliance with 42 C.F.R. section 431.12. Summary Judgment is GRANTED to Defendants on this claim.
The third issue contained in Count One of the Complaint is whether the new rules violate 42 C.F.R. section 447.253(e), which provides that "the Medicaid agency must provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates." 42 C.F.R. § 447.253(e).
It is undisputed that the new rules do not explicitly describe an appeals process that is available to providers unsatisfied with reimbursement determinations.[5] Defendants contend that while the new rules do not explicitly describe an appeals process available to Medicaid providers unsatisfied with their reimbursement rates, Indiana Code section 4-21.5-2-6(3) entitles Medicaid providers an opportunity for prompt administrative review of payment rate determinations. That section states explicitly that "this article [administrative orders and procedures] does apply to determinations by the office of Medicaid Policy and Planning concerning providers." Ind.Code Ann. § 4-21.5-2-6(3) (West Supp.1993). Indiana Code section 4-21.5-3-7(a) states that in order for a petitioner to qualify for review of agency action, the petitioner must demonstrate in writing that the petitioner is aggrieved or adversely affected by an order described elsewhere in the chapter. This includes determinations by the office of Medicaid Policy and Planning concerning Medicaid providers. Ind.Code.Ann. § 4-21.5-2-6(3) (West Supp.1993). The Plaintiffs' contention that the appeal procedure delineated in Indiana Code section 4-21.5-3-7 is applicable only once a provider has already been granted a right of appeal under another law is belied by the plain language of that section which allows for review of an agency order where either the petitioner is aggrieved or adversely affected by the order or where the petitioner is entitled to review under any law. See Ind.Code Ann. § 4-21.5-3-7 (West 1991). While this procedure is not the picture of clarity, it does provide an appeals mechanism to aggrieved Medicaid providers. As this is a legal rather than factual issue, summary judgment is appropriate, and is ORDERED in favor of the Defendants on this claim.

Counts Two and Three  Equal Access
Count Two of Plaintiffs' Complaint alleges that "the new rules do not assure that reimbursement for Medicaid physician and hospital services will allow Medicaid recipients in the City of Gary reasonable access to medical care equal in amount, duration, and quality to that available to non-Medicaid individuals." (¶ 109) The Plaintiffs allege that the new rules do not comply with 42 U.S.C. section 1396a(a)(30)(A), 42 U.S.C. section *1330 1396a(a)(10)(B), and 42 C.F.R. section 440.230.
Count Three of Plaintiffs' Complaint also alleges that violation of 42 U.S.C. section 1396a(a)(30)(A), as well as violations of 42 U.S.C. section 1396a(a)(2), 42 C.F.R. section 447.204 and 42 C.F.R. section 447.255. Count Three alleges that "the new rules will further reduce the physician and hospital services to Medicaid beneficiaries in the City of Gary so that such services will not be available at least to the extent available to the general population." (¶ 113)
Apparently, for the reasons that these counts allege similar claims and both allege a violation of 42 U.S.C. 1396a(a)(30)(A), the parties have addressed the disposition of both counts simultaneously in their briefing papers.
The confusion the parties display over how to analyze Counts Two and Three is well-founded, given the fact that both counts essentially allege the same facts; that the new rules do not satisfactorily fund Medicaid providers. Plaintiffs claim that the result of this inadequate funding is two-fold: First, Medicaid beneficiaries in the City of Gary will not have reasonable access to medical care in equal amount, duration, and quality to that available to individuals who are not Medicaid beneficiaries; and second, that the new rules will reduce physician and hospital services available to Medicaid beneficiaries in the City of Gary so that such services will not be available at least to the extent available to the general population. Both counts allege the same facts, and both assert the same claim; that the state's reimbursement rates are insufficient to comply with federal law. Accordingly, construing the pleadings in a manner so as to do substantial justice[6], in accordance with Federal Rule of Civil Procedure 12(f) the Court will STRIKE Count Three of the Plaintiffs' Complaint as redundant.
It is the duty of this Court to determine whether these claims state a cause of action under 42 U.S.C. section 1983. As noted above, the Court applies the Golden State Transit test in light of the decision in Suter, and must determine whether the allegations of the Complaint assert a violation of a federal right, for which Congress has not specifically foreclosed a remedy under section 1983. Golden State Transit, 493 U.S. at 106, 110 S.Ct. at 448.
It is alleged that the new rules do not assure that reimbursement for Medicaid physician and hospital services will allow Medicaid recipients in the City of Gary reasonable access to medical care equal an amount, duration, and quality to that available to non-Medicaid individuals. (Complaint, ¶ 109.) Plaintiffs contend that as Medicaid providers, they have a federal right to assured equal access for Medicaid recipients to care and services commensurate with that available to the general population in the geographic area. 42 U.S.C.A. § 1396a(a)(30)(A) ("the equal access provision") states:
A state plan for medical assistance must 
* * * * * *
(30)(A) provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.
42 U.S.C.A. § 1396a(a)(30)(A) (West Supp. 1994).
In order to determine whether the statute grants an enforceable right in favor of the Plaintiffs under section 1983, the Court must first determine whether the Plaintiffs, Medicaid providers, are the intended beneficiaries of this statute. Miller v. Whitburn, 10 F.3d 1315, 1319 (7th Cir.1993); see also Arkansas Medical Soc'y v. Reynolds, 6 F.3d 519, 523. In Arkansas Medical Soc'y, the Eighth Circuit Court of Appeals held that the equal access provision of the Medicaid Act created *1331 rights enforceable by Medicaid providers. Applying the reasoning used by the Supreme Court in Wilder, the Eighth Circuit found that the equal access provision was intended to benefit the Medicaid providers, because, like the Boren amendment at issue in Wilder, the equal access provision of the Medicaid Act concerned the reimbursement of Medicaid providers. 6 F.3d at 526; See also Nebraska Health Care Ass'n v. Dunning, 778 F.2d 1291, 1295 (8th Cir.1985), cert. denied, 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987) (Medicaid service providers could enforce compliance with the Medicaid laws); Oklahoma Nursing Home Ass'n v. Demps, 792 F.Supp. 721, 727 (W.D.Okla.1992) (Equal access provision grants a right in favor of health care providers). Following this authority, this Court concludes that the providers here are beneficiaries of the equal access provision which requires payment to Medicaid providers sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that care and services are available to the general population in the same geographic area.
In order to create a federal right which may be enforced under section 1983, a statute must also impose a binding obligation on the state government, as opposed to merely expressing "a congressional preference" for a certain kind of conduct. Miller, 10 F.3d at 1319. The equal access provision is phrased in sufficiently mandatory language to create a binding obligation on the state. Like the Boren amendment discussed in Wilder, the equal access provision is introduced by the compulsory language "a state plan for medical assistance must...." 42 U.S.C.A. § 1396a. Additionally, as pointed out by the court in Arkansas Medical Soc'y, the legislative history and context of the statute further evince that the equal access provision is mandatory rather than precatory. In 1989, Congress determined that the equal access provision, previously embodied only in federal regulations, was receiving inadequate enforcement. See H.R.Rep. No. 101-247, 101st Cong., 1st Sess. 389-90 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 2115-16. Accordingly, Congress placed this provision directly into the Medicaid Act. The House report stated that "the committee bill would codify, with one clarification, the current regulation, 42 C.F.R. 447.204, requiring adequate payment levels." H.R.Rep. No. 101-247, 101st Cong., 1st Sess. 390 (1989), reprinted in 1989 U.S.C.C.A.N. 2116; see Arkansas Medical Soc'y, 6 F.3d at 526. As the Eighth Circuit pointed out, the decision to place the equal access provision in the text of the Medicaid statute reinforces the conclusion that the provision is mandatory in nature and shows that Congress unambiguously conferred a right to enforce the provision upon the beneficiaries. 6 F.3d at 526.
The final inquiry into whether the equal access provision provides an enforceable right under section 1983 is to examine whether the interests asserted by the Plaintiffs are too vague and amorphous so as to be beyond the competence of the judiciary to enforce. Miller, 10 F.3d at 1319. Section (a)(30)(A) requires that a state Medicaid plan "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary ... to assure that payments ... are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C.A. § 1396a(a)(30)(A). Defendants contend that this language is vague and amorphous, and beyond the competence of the judiciary to enforce as there is no definition provided in the statute or applicable regulations for the terms "general population" and "geographic area." They maintain that as a result, it is not possible for the Court to identify the geographic area which Congress intended to serve as a control group for the purpose of comparing the state plan.
In Arkansas Medical Soc'y, the Eighth Circuit held that the equal access provision was not too vague or amorphous as to be judicially unenforceable. While the court recognized that the language of the statute was ambiguous, relying on the legislative history and HHS regulations, the court concluded that the equal access provision was within the competence of the judiciary to enforce. Comparing the equal access provision to the Boren amendment, which the Supreme Court *1332 in Wilder found to be sufficiently specific to be enforceable under section 1983, the court stated:
The Boren amendment talks about "reasonable access," and nowhere in the statute is that term defined.... The equal access provision, by contrast, actually gives a measuring rod for accessibility, which, as discussed above, is sufficiently specific. Both provisions contain almost identical language about efficiency, economy, and quality of care. The Wilder court found that such language provided an "objective benchmark," ... and we must agree. Both subsections leave room for states to use their discretion, but as noted in Wilder, such discretion does not place the language outside the competence of the judiciary to enforce. [citations omitted]
6 F.3d at 527. Additionally, other courts that have examined the language of the equal access provision have found it sufficiently specific to be enforceable by Medicaid providers, simply by comparing the statistical data which indicates the extent to which medical services available to the general population are also available to Medicaid recipients. See Fulkerson v. Commissioner, Maine Dept. of Human Services, 802 F.Supp. 529, 534 (D.Me.1992); Clark v. Kizer, 758 F.Supp. 572, 575-77 (E.D.Cal.1990); Illinois Hospital Ass'n v. Edgar, 765 F.Supp. 1343, 1349 (N.D.Ill.1991). However, none of these courts confronted the issue raised by Defendants in this action, that the term "geographic area" is not defined by the statute, the legislative history, or the regulations, and therefore, is beyond the competence of the judiciary to enforce.
The Court may only conclude that a federal right exists which may be enforced pursuant to 42 U.S.C. section 1983, where the statutory section upon which the purported right is based is one which is capable of judicial construction. The statute, legislative history, and the HHS regulations do not provide an objective benchmark by which the term "geographic area" can be defined. This Court is incapable of giving the term meaning where no guidance has been provided. Compare Suter v. Artist M., ___ U.S. at ___-___, 112 S.Ct. at 1368-69 (Where statutory language, legislative history, and regulation failed to provide guidance as to interpretation of "reasonable efforts" which state was required to make to prevent or eliminate the need for removal of a child from the house prior to placement in foster care, this statutory mandate did not unambiguously confer an enforceable right upon the statute's beneficiaries.)
The importance of this point is clear. In order for this Court to determine whether the new rules comply with the equal access provision, the Court must compare the statistical data indicating the extent to which medical services available to the general population in the geographic area are also available to Medicaid recipients in the same area. Cf. Fulkerson v. Commissioner, 802 F.Supp. at 534. The statistical population which serves as the "geographic area" in which this comparison takes place may well determine, and definitely will influence, the conclusion as to whether the reimbursement rates are sufficient to comply with the equal access provision. However, there is no objective benchmark which informs this Court on how to determine the boundaries of the relevant "geographic area."
The unworkability of this standard is illustrated by the parties' contentions on summary judgment. Defendants support their motion by reference to statistics which show a statewide ratio of Medicaid recipients to Medicaid providers of 213 to 1, in contrast to a statewide ratio of residents to doctors of 1,440 to 1. They go on to compare the proposed new rates to rates paid by Medicare and private insurers, concluding that Medicaid rates were high in comparison to other payers and in comparison to other states, and that access for Medicaid recipients would not be impaired by reducing the rates as specified by the new rules. The Plaintiffs' evidence in opposition to summary judgment is of a quite different nature, and focuses on the health care delivery system in the City of Gary. The contrast between the evidence relied upon by Plaintiffs' and Defendants highlights the ambiguity of the statutory language. The term "geographic area" is not defined in the statute, nor is it capable of being defined by reference to other materials. *1333 As a result, the Court is incapable of enforcing this provision, and consequently, the equal access provision, 42 U.S.C.A. § 1396a(a)(30)(A), does not create a right enforceable under section 1983.
Plaintiffs further contend that the allegations in Count II of the Complaint are sufficient to support a 1983 cause of action for a violation of 42 U.S.C.A. section 1396a(a)(10)(B), and 42 C.F.R. section 440.230, the implementing regulation of that section.
Section (a)(10)(A) defines the class of individuals to whom Medicaid benefits are available. Subsection (i) defines those Medicaid recipients commonly referred to as "categorically needy," which includes public assistance recipients and persons receiving supplemental security income. 42 U.S.C.A. § 1396a(a)(10)(A)(i) (West Supp.1994). Subsection (ii) describes those Medicaid recipients who are eligible to receive medical benefits under the plan at the option of the state, commonly referred to as "medically needy" recipients. See generally Sobky v. Smoley, 855 F.Supp. 1123, 1151 (E.D.Cal.1994). Section (a)(10)(B) requires that the medical assistance made available to any individual described in section (a)(10)(A):
(i) shall not be less an amount, duration, or scope than the medical assistance made available to any other such individual, and
(ii) shall not be less in amount, duration, or scope than the medical assistance made available to [medically needy] individuals.
42 U.S.C.A. § 1396a(a)(10)(B) (West Supp. 1994). In essence, this section creates an equality principle by which all categorically needy individuals must receive medical assistance which is no less than that provided to any other categorically or medically needy individual. Sobky, 855 F.Supp. at 1138. See also Greenstein by Horowitz v. Bane, 833 F.Supp. 1054, 1067 (S.D.N.Y.1993). "Section 1396a(a)(10)(D) creates a federal right that can be enforced under section 1983 by those plaintiffs who are categorically needy within the meaning of 42 U.S.C. section 1396a(a)(10)(A)." Sobky, 855 F.Supp. at 1139. The beneficiaries of this provision are Medicaid recipients, not Medicaid providers. Compare Miller v. Whitburn, 10 F.3d 1315 (7th Cir.1993) (Medicaid recipient has cause of action under section 1983 to challenge Wisconsin Department of Health and Social Services decision not to fund liver-valve transplant as violative of 42 U.S.C.A. 1396a(a)(10)(A)); Sobky, 855 F.Supp. 1123 (class of Medicaid recipients has right enforceable under section 1983 to challenge state's failure to fund methadone maintenance program for all categorically needy who are eligible for the service); Greenstein by Horowitz v. Bane, 833 F.Supp. 1054, 1057 (class of Medicaid recipients has right enforceable under section 1983 to enforce section (a)(10)(B)); King by King v. Fallon, 801 F.Supp. 925, 934 (D.R.I.1992) (mentally retarded Medicaid recipients have right enforceable under section 1983 to enforce 42 U.S.C. section 1396a(a)(10)(B) requiring that categorically and medically needy are entitled to same services).
The parties have not provided, nor has this Court's independent research revealed, any case in which Medicaid providers were found to be the intended beneficiaries of this provision of the Medicaid Act requiring that medical assistance made available to the categorically needy is equal in amount, duration, and scope to medical assistance made available to other categorically and medically needy individuals. Clearly, Medicaid recipients are the intended beneficiaries of this section, and the section does not provide a right enforceable to Medicaid providers, such as Plaintiffs in this action. Additionally, the Court notes that the Plaintiffs' Complaint, although making reference to this section, does not allege facts, which if taken as true, would equal a violation of 42 U.S.C.A. section 1396a(a)(10)(B). It alleges only that the new rules "do not ensure that reimbursement for Medicaid physician and hospital service will allow Medicaid beneficiaries in the City of Gary reasonable access to medical care in amount, duration and quality to that available to non-Medicaid individuals" (¶ 109) (emphasis added), and that the new rules "will further reduce the physician and hospital services available to Medicaid beneficiaries in the City of Gary so that such services will not be available at least to the extent available to the general population." (¶ 113.)
*1334 Additionally, although it is not briefed in more than a footnote by either party, Plaintiffs Complaint also alleges a violation of 42 U.S.C. § 1396a(a)(2). This section requires a state plan for medical assistance to "... provide for financial participation by the State equal to all of [the nonfederal share of the expenditures under the plan] or provide for distribution of funds from Federal or State sources, for carrying out the State plan, on an equalization or other basis which will assure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan." 42 U.S.C.A. § 1396a(a)(2) (West Supp.1994).
This section requires a state to provide the non-federal funds necessary to implement the state Medicaid plan and to distribute those funds on a basis which will assure that lack of adequate funds from local sources will not result in a reduction in care available under the plan. Because the intended beneficiaries of this section are Medicaid recipients, who will suffer if care is reduced under the plan, the Court holds that the Plaintiffs in the instant action, Medicaid providers, do not have a right enforceable under section 1983 to challenge the new rules as violative of section 1396a(a)(2).
This result is consistent with Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 110 S.Ct. 2510, where the Supreme Court found that the intended beneficiaries of the Boren Amendment to the Medicaid Act were not only Medicaid recipients, but also Medicaid providers. The Court based this holding on the language of the Boren Amendment, which "establishes a system for reimbursement of providers and is phrased in terms of benefiting health care providers: it requires a state plan to provide for `payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan.'" 496 U.S. at 510, 110 S.Ct. at 2517-18 (emphasis omitted). Based upon this reasoning, the Eighth Circuit Court of Appeals found that equal access provision of the Medicaid Act, 42 U.S.C.A. § 1396a(a)(30)(A), was intended to benefit Medicaid providers, because the language of that provision also concerned the reimbursement of Medicaid providers. 6 F.3d at 526; see discussion supra at ___.
The provision at issue presently, 42 U.S.C.A. § 1396a(a)(2) does not speak directly to the level of payments which must be made to Medicaid providers in order to comply with federal law. At such, it does not bestow upon Medicaid providers a right to seek its enforcement by way of a section 1983 suit. Plaintiff's have not vigorously argued otherwise, nor has this Court unearthed any relevant precedent which would allow a 1983 action to enforce this provision. Accordingly, the Court holds that Medicaid providers are not the intended beneficiaries of section 1396a(a)(2), and that assuming the truth of Plaintiffs' well pleaded factual allegations, making all possible inferences in the Plaintiffs' favor, Plaintiffs have failed to state a claim upon which relief may be granted.
Accordingly, Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, as to Count II of the Plaintiffs' Complaint is GRANTED.

Count IV  Regulatory Taking
Count IV of the Plaintiffs' Complaint alleges that "the promulgation and application of the new rules to reduce reimbursement for hospital and physician services deprives Plaintiffs of property without due process of law in violation of the due process clause of the Fourteenth Amendment of the United States Constitution." (¶ 120.)
It has long been recognized that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). This oft-quoted maxim, and the takings clause of the Fifth Amendment, apply with equal force to "regulatory takings." Garelick v. Sullivan, 987 F.2d 913, 916 (2d Cir.1993). However, for regulations to give rise to a taking, a property owner must be legally compelled to engage in price regulated activity. Id.; see also Bowles v. Willingham, 321 U.S. 503, 517-18, 64 S.Ct. 641, 648-49, 88 L.Ed. 892 (1944); Minnesota Ass'n of Health Care Facilities *1335 v. Minnesota Dept. of Public Welfare, 742 F.2d 442, 446 (8th Cir.1984), cert. denied, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). "Where a service provider voluntarily participates in a price regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking." Garelick, 987 F.2d at 916 (citations omitted).
Plaintiffs claim that they are mandated by federal law to examine and medically stabilize any individual who comes to the hospital's emergency department and requests examination or treatment. 42 U.S.C.A. § 1395dd (West 1992). However, Plaintiffs do not argue, nor can they, that the individual doctors who are parties to this action are compelled to provide mandatory service. The physicians are not obligated by law to practice medicine at Methodist, nor are they obligated to serve Medicaid patients. Accordingly, the Court must reject their takings claim. Cf. Garelick v. Sullivan, 987 F.2d 913, 917; Whitney v. Heckler, 780 F.2d 963 (11th Cir.1986); Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dept. of Public Welfare, 742 F.2d 442 (8th Cir.1984), cert. denied, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).
Whether the new reimbursement rates constitute a taking of the hospital's property without due process of law is a more interesting question. There is no "set formula" for determining when government regulation of private property constitutes a compensable taking. "Whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely `upon the particular circumstances [in that] case.'" Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958)). However, the Supreme Court has identified several factors that have significance in this inquiry. "The economic impact of the regulation on the claimant, and particularly, the extent to which the regulation has interfered with distinct investment-backed expectations," are relevant to takings analysis. Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659. Also important is the character of the governmental action. Id. "A `taking' may more readily be found when the interference with property can be characterized as a physical invasion by the government ... than when interference arises from some public program adjusting the benefits and burden of economic of life to promote common good." Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659.
The new rule with regard to emergency care reimbursement states:
Emergency care (as identified by the outpatient hospital department) payments will be based on statewide fee schedule per HCPCS code. The fee schedule amount will be equal to the Indiana Medicaid statewide median amount paid per service during fiscal year 1992.
See 405 I.A.C. § 1-8-2-4 (LSA Doc. # 93-115, Outpatient Hospital Services). The new rule further states:
Non-emergency care, determined by the office [of Medicaid Policy and Planning] and as identified by non-emergency diagnosis codes, that is provided in an emergency room, shall be paid based upon a non-emergency setting (for example, a clinic) fee schedule established by the office. This fee schedule amount will be equal to the Indiana Medicaid statewide median amount paid per service during fiscal year 1992.
Id.
Whether this methodology, which reimburses hospitals for emergency care equal to the Indiana Medicaid statewide median amount paid per service during fiscal year 1992, and which compensates, under a similar non-emergency fee schedule, service provided in an emergency room, but which is determined to be non-emergency service, works a "taking" of the hospital's property without due process of law must be determined by reference to the analysis set forth by the Supreme Court in Penn Central. See 438 U.S. at 124, 98 S.Ct. at 2659. This analysis raises questions of fact which are not capable of resolution by this Court at this stage in the proceedings. While the materials submitted *1336 in support and in opposition to Defendants' Motions for Summary Judgment may be considered at this stage, these pleadings, depositions and affidavits do not "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Accordingly, Defendants' Motion to Dismiss Count IV or in the Alternative for Summary Judgment is DENIED as to the Plaintiff, Methodist, and is GRANTED as relates to the individual physician-Plaintiffs.

Count V  Title VI of the Civil Rights Act of 1964
Count V of the Complaint alleges that "the new rules will result in unlawful discrimination because the inadequacy of the reimbursement rates will restrict the quantity, quality, and access to services to Medicaid patients and such reductions in medical services will result in a disparate impact on Medicaid recipients in violation of the Civil Rights Act of 1964, Title VI...." (Complaint, ¶ 122.)
Based on this allegation, Defendants contend that Plaintiffs lack standing to maintain a Title VI action, as they cannot raise these issues on behalf of "minority Medicaid recipients", and do not allege in the Complaint that they have been the victims of any discrimination prohibited by Title VI, or that any injury that they may sustain is traceable to racially motivated conduct.
The federal judicial power under Article III of the Constitution extends only to "cases" or "controversies." "The constitutional limitation on standing eliminates cases in which a plaintiff can demonstrate no `case or controversy' between himself and the defendant." Family & Children's Center, Inc. v. School City of Mishawaka, 13 F.3d 1052, 1058 (7th Cir.1994). The "irreducible constitutional minimum" of standing requires allegations that: First, the Plaintiff suffered an injury in fact, which is concrete and particularized, and actual or imminent; second, that there is a causal connection between the injury and conduct complained of; and third, that a favorable federal court decision likely would redress or remedy the injury. Lujan v. Defenders of Wildlife, 504 U.S. ___, ___, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The party invoking the federal courts' jurisdiction has the burden of establishing these elements, but at the pleading stage general factual allegations of injury resulting from the defendant's conduct may suffice. Lujan, 504 U.S. at ___-___, 112 S.Ct. at 2136-37.
The allegations of the Complaint fail to satisfy the first element of Lujan. While Article III standing requirements are rather "undemanding," North Shore Gas Company v. EPA, 930 F.2d 1239, 1242 (7th Cir.1991), to satisfy the first part of the test the Plaintiff must allege an "actual or imminent" injury that is "concrete and particularized" to the party asserting the claim. Lujan, 504 U.S. at ___, 112 S.Ct. at 2136; see also Family & Children's Center, 13 F.3d at 1058. "The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered `some threatened or actual injury resulting from the putatively illegal action....'" Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)). A plaintiff must generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. Warth, 422 U.S. at 499, 95 S.Ct. at 2205.
Count V of the Plaintiffs' Complaint does not allege that implementation of the new rules will result in discrimination against or injurious to the Plaintiffs in violation of Title VI of the Civil Rights Act of 1964. This Count fails to allege the necessary prerequisites of standing. This result is in no way affected by the Seventh Circuit's pronouncement in Doe on behalf of Doe v. St. Joseph's Hospital, that "in order to bring a private action under Title VI the plaintiff must be intended beneficiary of, an applicant for, or a participant in a federally funded program." 788 F.2d 411, 418-19 (7th Cir.1986) (quotation, citations, and footnotes omitted). Only those participants who allege that they are victims of racial discrimination in violation of Title VI may bring a private action under the statute. Plaintiffs do not allege standing, and accordingly they have failed to state a claim upon which relief can be granted under *1337 Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d (West 1981).
Plaintiffs make an additional claim in Count V of the Complaint that enforcement of the new rules will violate a consent decree filed July 17, 1979, in Terry v. Methodist Hospital of Gary, Inc., Cause Nos. H76-373, H77-154. In those actions, the class of all black residents of the City of Gary, Indiana, brought suit against the instant Plaintiffs, Joseph Califano as United States Secretary of Health, Education & Welfare, William T. Paynter, M.D., as State Health Commissioner for the Indiana State Board of Health, James White, as Director of the Division of Hospital and Institutional Services of the Indiana State Board of Health, David J. Edwards, M.D., as Director of the Health Facilities Services and Review Development Bureau of the Indiana State Board of Health, and Kipton Kaplan, Executive Director of the Northern Indiana Health Systems Agency. The Plaintiffs alleged the existence, perpetuation, and expansion of racially segregated and discriminatory hospital facilities operated by Methodist, and the illegal approval and granting of federal financial assistance to Methodist by the defendant federal and state officials. The defendants denied the allegations of the Complaint. The case was settled by way of the aforementioned consent decree, which imposed obligations on Methodist to construct new facilities for the benefit of Gary residents, and upon the defendant-state officials to encourage facility construction in designated areas of Gary. (See Complaint, Exh. T at 21.)
The purpose of a consent decree is "to avoid protracted litigation by entering into a court-supervised agreement that resolves the dispute to the satisfaction of all parties concerned and guarantees the viability of the agreement under the watchful eye of the judge whose signature appears at the end of the document. If the defendant violates the terms of the consent decree, the plaintiff's recourse is to bring an action to enforce the decree." United States v. City of Northlake, Illinois, 942 F.2d 1164, 1167 (7th Cir.1991). See also EEOC v. Liberty Trucking Co., 695 F.2d 1038, 1043-44 (7th Cir.1982) (noting that consent decrees can be enforced directly in federal court through contempt proceedings).
The consent decree entered by Judge McNagny involved none of the instant Defendants and did not concern Medicaid funding; instead it concerned a civil rights action brought by black citizens of Gary against the Plaintiff, Methodist, various state officials, and the federal government, seeking additional health care facility construction. The Plaintiffs here do not allege that the new rules will prevent the Defendants, or any other state agency or officials, from complying with the state's obligations under the consent decree. As such, this allegation in Count V of the Complaint fails to state a claim upon which relief can be granted. It seems that Plaintiffs' proper recourse, in the event they believe that the new rules will prevent the Defendants, or any other state officials or agencies, from complying with the state's obligations under the consent decree, would be to file a motion for enforcement or contempt in those actions for which the Court has retained jurisdiction.
As Count V of the Complaint fails to state a claim upon which relief can be granted, it is hereby ORDERED DISMISSED without prejudice.

CONCLUSION
For the reasons set forth above, the Court issues the following rulings:
Plaintiffs' Motion to Strike the Declaration of James Verdier is DENIED. Defendants' Motion to Dismiss or in the Alternative for Summary Judgment is GRANTED IN PART and DENIED IN PART. Summary Judgment is ORDERED as to Count I of the Plaintiffs' Complaint; Count II of the Plaintiffs' Complaint is DISMISSED with prejudice; Count III of the Plaintiffs' Complaint is STRICKEN. Defendants' Motion to Dismiss or in the Alternative for Summary Judgment as to Count IV is GRANTED as to the claims asserted by the Plaintiff-Physicians, but is DENIED as to the claims asserted by the Plaintiff, Methodist. Count V of the Complaint is DISMISSED for failure to state a claim upon which relief can be GRANTED.
In accordance with Rule 54(b), the Court ORDERS the Clerk to enter final judgment as to Counts I and II of the Complaint, stating that "the Plaintiffs are DENIED all relief on Count I of the Complaint challenging the failure to the Defendants to provide *1338 adequate public notice with regard to the State of Indiana's newly promulgated Medicaid reimbursement rules, challenging the failure of the Defendants to consult with a medical care advisory committee prior to promulgation and implementation of the new Medicaid reimbursement rules, and failure to include an appeals mechanism as required by federal law. The Plaintiffs are DENIED all relief as to Count II of the Complaint challenging the failure to the new rules to assure that reimbursement for Medicaid physician and hospital services will allow Medicaid beneficiaries in the City of Gary reasonable access to medical care in equal amount, duration, and quality to that available to non-Medicaid individuals, and challenging the sufficiency of the rules to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."
NOTES
[1] By order dated February 18, 1994, this Court dismissed as defendants the Indiana Family and Social Services Administration and the Indiana Office of Medicaid Policy and Planning.
[2] The framework established by Golden State Transit and Wilder to determine whether federal statutory and regulatory schemes give rise to the right to sue under section 1983 is now less clear in light of the decision of the Supreme Court in Suter v. Artist M., ___ U.S. ___, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). This case concerned the enforceability of a provision in the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C.A. §§ 620-628, 670-679a (West 1991). The Supreme Court held that the plaintiffs could not bring a section 1983 action to enforce a statutory requirement that the Illinois Department of Children and Family Services use "reasonable efforts" to prevent the need for removing a child from his home and to make it possible for the child to return home. Suter, ___ U.S. at ___, 112 S.Ct. at 1370. While the Court did not reverse either of these cases, it did not employ the two-step analysis of Golden State Transit and Wilder. Rather, in examining whether the "reasonable efforts" language of the AACWA created an enforceable private right of action, the Suter court recognized that the AACWA was mandatory in its terms in that it required the states to have a plan approved by the U.S. Secretary of Health & Human Services, which was required to provide that "reasonable efforts" would be made to prevent or eliminate the need for removal of a child from the home before placement of the child in foster care. However, the Court also noted that the language of the AACWA and its implementing regulations failed to provide guidance as to how "reasonable efforts" were to be measured. ___ U.S. at ___, 112 S.Ct. at 1368-69. Although the Court recognized the states' mandatory duty under the AACWA, it also found that the states were given much discretion in determining the terms of their compliance with the AACWA. Id. The Court therefore concluded that Congress intended to impose upon the states only a generalized duty not enforceable not by private citizens, but by the Secretary of Health & Human Services. The generalized duty, the Court concluded, was too vague to permit an inference that Congress intended to create a right enforceable through section 1983. ___ U.S. at ___, 112 S.Ct. at 1370.

Courts called upon to determine the applicability of a section 1983 remedy to enforce a statutory or regulatory scheme have struggled with this decision and its impact upon the well-established approach employed by Golden State Transit and Wilder. For the most part, the courts have managed to harmonize Suter with Wilder and Golden State Transit. See Martin v. Voinovich, 840 F.Supp. 1175, 1194-95 (S.D.Ohio 1993) (and cases cited therein). The Seventh Circuit, following the First Circuit's decision in Stowell v. Ives, 976 F.2d 65 (1st Cir.1992), has found it "both prudent and possible to synthesize the teachings of Suter with the court's prior precedents." Procopio v. Johnson, 994 F.2d 325, 331 n. 9 (7th Cir.1993); see also Miller v. Whitburn, 10 F.3d 1315, 1319 (7th Cir.1993) ("Suter ... is not the death knell of the analytical framework established in Wilder.... [Under Suter] a cause of action under section 1983 would lie `when the statute and regulations set forth in some detail' the factors to be considered in ascertaining whether a state has complied with a federal mandate."); King v. Bradley, 829 F.Supp. 989, 992 n. 1 (N.D.Ill.1993). Employing the precedent of this Circuit, the Suter and Wilder cases must be synthesized so that the teachings of Suter inform this Court's analysis under Wilder. This approach is used here.
[3] 42 U.S.C.A. § 1396a(a)(30)(A) (West Supp. 1994).
[4] 42 U.S.C.A. § 1396a(a)(28)(C) (West Supp. 1994).
[5] The former outpatient reimbursement rule codified at 405 I.A.C. section 1-8-1 expressly granted providers the right to appeal outpatient reimbursement decision pursuant to the appeals procedures contained in 470 I.A.C. section 1-4-1 et seq. The new rules published in L.S.A. Doc. No. 93-115, repeal 405 I.A.C. section 1-8-1 without re-establishing the provider's right to appeal outpatient reimbursement determinations.
[6] Federal Rule of Civil Procedure 8(f).